IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ADAM NORCROSS,            :
                               :
          Petitioner,     :
                               :
     v.                   :     Civil Action No. 12-09-CFC
                               :
DANA METZGER, Warden, and :
ATTORNEY GENERAL OF THE :
STATE OF DELAWARE,      :
                               :
          Respondents.   :

---

Marshall Dayan. Assistant Federal Public Defender, Western District of Pennsylvania, Pittsburgh, Pa. Attorney for Petitioner.

Maria T. Knoll, Deputy Attorney General of the Delaware Department of Justice, Wilmington, Delaware. Attorney for Respondents.

---

**MEMORANDUM OPINION**[1]

March 31, 2020
Wilmington, Delaware

---

[1]This case was originally assigned to the Honorable Gregory M. Sleet, and was re-assigned to the undersigned judge on September 20, 2018.

*Ch. F. C.*

CONNOLLY, UNITED STATES DISTRICT JUDGE:

Pending before the Court is Petitioner Adam Norcross' Amended Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 ("Petition"). (D.I. 52) The State filed an Answer, to which Petitioner filed a Reply. (D.I. 55; D.I. 63) For the reasons discussed, the Court will deny the Petition.

I.    **BACKGROUND**

A.    **Factual Background**

The events leading up to Petitioner's arrest and trial are set forth below, as summarized by the Delaware state courts in Petitioner's first Rule 61 proceeding and post-conviction appeal:

> Shortly after 8 p.m. on November 4, 1996, the Warren family was settling in for a night in their Kenton, Delaware home. Kenneth Warren was sitting at the kitchen bar eating a sandwich while his wife and son relaxed in the family room watching television. Suddenly, two masked men dressed in camouflage burst through the glass patio doors leading to the family room. The intruders shot Kenneth four times while his wife and son watched in horror. The intruders grabbed a purse on the kitchen counter and fled.

> *       *       *       *

> In November 1996, police found the wife's purse behind the rear fence of the Eastern Shore Concrete Company in Middletown, Delaware. The discovery of the purse did not lead to any suspects even though [Petitioner] and Ralph Swan both worked at the Eastern Shore Concrete Company at the time of the murder. About a month before the murder, [Petitioner's] former roommate reported the theft of two handguns: a .357 caliber Smith & Wesson revolver and a .40 caliber Smith & Wesson handgun. Examination of the bullets removed from Kenneth Warren's body revealed that the two back wounds were made by .357 caliber bullets and the fatal

wound was made by a 10mm/.40 Smith & Wesson caliber triple copper jacketed bullet.

*Norcross v. State*, 36 A.3d 756, 760 (Del. 2011).

In December 1999, [Petitioner's] ex-wife Bridgette Phillips contacted police and told them about a conversation about the shooting that she had overheard between [Petitioner and his co-defendant, Ralph Swan]. [Petitioner] later told Phillips that he and Swan had planned to rob an empty house, but it turned out to be occupied. [Petitioner] told Phillips that Swan had been shot in the shoulder and so [Petitioner] had to kill the homeowner. [Petitioner] said the men had worn masks and would never be caught.

[...] [Petitioner] told quite a different story to police than the one he had told Phillips. He acknowledged being present during the crime, but said that Swan started the shooting and that [Petitioner's] gun would not fire so Swan grabbed it, cleared and shot Warren in the head with [Petitioner's] gun. [Petitioner] also stated that Swan wanted to go back in the house and kill the woman so she would not be able to identify them. [Petitioner] shot Swan in the shoulder to prevent him from returning to the house. The men got rid of their guns and Tina [Warren's] purse at the concrete plant where they both worked.

[Petitioner] told yet another version of the crime to his friend Matthew Howell, who also worked at the concrete plant. Howell testified that [Petitioner] told him that he and Swan had planned to commit a robbery but that it had gone wrong. When they broke in, a man inside fired at them and they returned fire. [Petitioner] claimed to have shot Warren in the head, and that Swan had been hit in the shoulder either by the homeowner or by crossfire. [Petitioner] stated that he did not trust Swan and he threatened to kill Howell if Howell reported the story to the police.

[Petitioner] told his girlfriend, Gina Ruberto, that he and Swan had broken into a house in Kenton, Delaware and that a man inside had a gun. [Petitioner] stated that his own gun jammed and that Swan shot the man, who shot Swan in the shoulder. [Petitioner] said he and Swan burned the fatigues they had been wearing and that he threw his gun in the

2

water. [Petitioner] indicated that he was upset about the
incident because no one was supposed to get hurt.

*State v. Norcross*, 2010 WL 1493120, at *1 (Del. Super. Ct. Apr. 8, 2010).

## B. Procedural Background

In April 2000, a Kent County grand jury indicted Petitioner on three counts of first

degree murder (one count of intentional murder and two counts of felony murder); first

degree robbery; first degree burglary; second degree conspiracy; five counts of

possession of a deadly weapon during the commission of a felony ("PDWDCF"); and

possession of a deadly weapon by a person prohibited ("PDWBPP"). (D.I. 55 at 3)

Petitioner filed a motion to suppress on November 17, 2000. After holding an

evidentiary hearing on December 19, 2000, the Superior Court denied the motion to

suppress. On February 8, 2001, the Superior Court granted Petitioner's motion to sever

the PDWBPP charge. *Id*.

Jury selection began on April 16, 2001 and lasted five days. Beginning on April

24, 2001, the Superior Court held an eleven-day jury trial. (D.I. 55 at 3) The jury found

Petitioner guilty of all charges except conspiracy. Beginning on May 14, 2001, the

Superior Court held a five-day penalty hearing, after which the jury recommended a

sentence of death by a vote of ten to two. *Id*. On May 24, 2001, Petitioner filed a

motion for a new trial, which the Superior Court denied on July 17, 2001. *See State v.

Norcross*, 2001 WL 845753 (Del. Super. Ct. July 17, 2001). On October 3, 2001, the

Superior Court imposed a sentence of death for each murder conviction, and 130 years

of imprisonment for Petitioner's remaining convictions. *See State v. Norcross,* 2001

WL 1223198 (Del. Super. Ct. Oct. 3, 2001). The Delaware Supreme Court affirmed

Petitioner's convictions and sentence on February 5, 2003. *See Norcross v. State*, 816 A.2d 757 (Del. 2003), *cert. denied, Norcross v. Delaware*, 540 U.S. 833 (2003).

On July 30, 2004, Petitioner filed a motion for postconviction relief pursuant to Delaware Superior Court Criminal Rule 61, and then filed an amended Rule 61 motion on March 9, 2006 (hereinafter collectively referred to as "Rule 61 motion"). (D.I. 55 at 4) Petitioner's two trial counsel filed affidavits in response to Petitioner's motion on June 16, 2006. The Superior Court held a total of ten days of evidentiary hearings on Petitioner's Rule 61 motion. Following post-hearing briefing, the Superior Court denied Petitioner's Rule 61 motion on April 8, 2010. *See State v. Norcross*, 2010 WL 1493120 (Del. Super. Ct. Apr. 8, 2010). Petitioner appealed, and the Delaware Supreme Court remanded the matter for additional consideration of the claims of ineffective assistance of counsel regarding mitigation. *See Norcross v. State*, No. 218, 2010 (Del. Jan. 31, 2011). On May 11, 2011, the Superior Court denied the Rule 61 motion on remand. *See Norcross v. State*, 2011 WL 2027952 (Del. Super. Ct. May 11, 2011). The Delaware Supreme Court affirmed the Superior Court's judgment on December 21, 2011, and issued its mandate on January 6, 2012. *See Norcross v. State*, 36 A.3d 756 (Del. 2011).

Petitioner filed a federal petition for a writ of habeas corpus on February 24, 2012. (D.I. 11) The State filed an answer and state court records on June 25, 2012. (D.I. 12; D.I. 13; D.I. 14; D.I. 15; D.I. 16) Petitioner filed a traverse on October 11, 2012 (D.I. 21) On September 29, 2014, Petitioner filed a supplemental pleading and appendix in support of his habeas petition. (D.I. 29; D.I. 29-1; D.I. 30-2) The State filed a

4

response in November, 2014, to which Petitioner filed a reply. (D.I. 33; D.I. 35) On June 3, 2015, the Court granted Petitioner's motion to stay proceedings in light of *Hurst v. Florida*, 136 S.Ct. 616 (2016). (D.I. 38) On February 22, 2016, Petitioner filed an agreed-to amendment to his habeas petition in light of the *Hurst* decision. (D.I. 41) On July 11, 2016, Petitioner filed in the Delaware Superior Court a second Rule 61 motion, asking the Superior Court to find Delaware's death penalty scheme unconstitutional under *Hurst*. (D.I. 55 at 5) On January 23, 2017, in light of the Delaware Supreme Court decisions in *Rauf v. State,* 145 A.3d 430 (Del. 2016) and *Powell v. State*, 153 A.3d 69 (Del. 2016), the Superior Court issued a show cause order to the State to show why Petitioner's death sentence should not be vacated and Petitioner be resentenced to imprisonment for the remainder of his natural life without the benefit of probation or any other reduction. (D.I. 55 at 5) The State agreed that, based on the recent Delaware Supreme Court decisions, Petitioner should be resentenced to life without the possibility of parole or any other reduction. *Id.* Petitioner disagreed and, arguing that 11 Del. C. § 4209 was unconstitutional in its entirety, filed a motion asking for a new sentencing proceeding under 11 Del. C. § 4205(b)(2). *Id.* at 5-6. Petitioner also amended his Rule 61 motion to add a claim regarding his sentencing. *Id.* at 6.

On February 21, 2017, the Superior Court denied Petitioner's motion to be sentenced under 11 Del. C. § 4205(b)(2). (D.I. 55 at 6) Petitioner appealed. On June 9, 2017, the Superior Court resentenced Petitioner for each of his first degree murder convictions to the balance of his natural life at Level V, to be served without the benefit

of probation or parole or any other reduction. *Id.* The Superior Court re-imposed Petitioner's sentences on his remaining charges. On January 2, 2018, the Delaware Supreme Court affirmed the Superior Court's judgment. On May 2, 2018, the Delaware Superior Court summarily dismissed Petitioner's second Rule 61 motion as moot. *Id.* at 6.

On June 29, 2018, the Court lifted the stay on the instant proceedings. (D.I. 45) Petitioner filed an Amended Petition ("Petition") and an exhibit. (D.I. 52) The State filed an Answer, to which Petitioner filed a Reply. (D.I. 55; D.I. 63)

## II.   GOVERNING LEGAL PRINCIPLES

### A. The Antiterrorism and Effective Death Penalty Act of 1996

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "to reduce delays in the execution of state and federal criminal sentences . . . and to further the principles of comity, finality, and federalism." *Woodford v. Garceau*, 538 U.S. 202, 206 (2003). Pursuant to AEDPA, a federal court may consider a habeas petition filed by a state prisoner only "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Additionally, AEDPA imposes procedural requirements and standards for analyzing the merits of a habeas petition in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

### B. Exhaustion and Procedural Default

Absent exceptional circumstances, a federal court cannot grant habeas relief unless the petitioner has exhausted all means of available relief under state law. *See*

28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842-44 (1999); *Picard v. Connor*, 404 U.S. 270, 275 (1971). AEDPA states, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that –
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(i) there is an absence of available State corrective process; or
> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

The exhaustion requirement is based on principles of comity, requiring a petitioner to give "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 844-45; *see Werts v. Vaughn*, 228 F.3d 178, 192 (3d Cir. 2000). A petitioner satisfies the exhaustion requirement by demonstrating that the habeas claims were "fairly presented" to the state's highest court, either on direct appeal or in a post-conviction proceeding, in a procedural manner permitting the court to consider the claims on their merits. *See Bell v. Cone*, 543 U.S. 447, 451 n.3 (2005); *Castille v. Peoples,* 489 U.S. 346, 351 (1989). If the petitioner raised the issue on direct appeal in the correct procedural manner, the claim is exhausted and the petitioner does not need to raise the same issue again in a state post-conviction proceeding. *See Lambert v. Blackwell,* 134 F.3d 506, 513 (3d Cir. 1996).

If a petitioner presents unexhausted habeas claims to a federal court, and further state court review of those claims is barred due to state procedural rules, the federal court will excuse the failure to exhaust and treat the claims as exhausted. *See Coleman v. Thompson*, 501 U.S. 722, 732, 750-51 (1991) (such claims "meet[] the technical requirements for exhaustion" because state remedies are no longer available); *see also Woodford v. Ngo*, 548 U.S. 81, 92-93 (2006). Such claims, however, are procedurally defaulted. *See Coleman*, 501 U.S. at 749; *Lines v. Larkins*, 208 F.3d 153, 160 (3d Cir. 2000). Similarly, if a petitioner presents a habeas claim to the state's highest court, but that court "clearly and expressly" refuses to review the merits of the claim due to an independent and adequate state procedural rule, the claim is exhausted but procedurally defaulted. *See Coleman*, 501 U.S. at 750; *Harris v. Reed*, 489 U.S. 255, 260-64 (1989).

Federal courts may not consider the merits of procedurally defaulted claims unless the petitioner demonstrates either cause for the procedural default and actual prejudice resulting therefrom, or that a fundamental miscarriage of justice will result if the court does not review the claims. *See McCandless v. Vaughn,* 172 F.3d 255, 260 (1999); *Coleman,* 501 U.S. at 750-51. To demonstrate cause for a procedural default, a petitioner must show that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate actual prejudice, a petitioner must show that the errors during his trial created more than a possibility of prejudice; he must show that the

errors worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Id.* at 494.

Alternatively, if a petitioner demonstrates that a "constitutional violation has probably resulted in the conviction of one who is actually innocent,"[2] then a federal court can excuse the procedural default and review the claim in order to prevent a fundamental miscarriage of justice. *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Wenger v. Frank*, 266 F.3d 218, 224 (3d Cir. 2001). The miscarriage of justice exception applies only in extraordinary cases, and actual innocence means factual innocence, not legal insufficiency. *See Bousley v. United States*, 523 U.S. 614, 623 (1998); *Murray*, 477 U.S. at 496. A petitioner establishes actual innocence by asserting "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial," showing that no reasonable juror would have voted to find the petitioner guilty beyond a reasonable doubt. *Hubbard v. Pinchak*, 378 F.3d 333, 339-40 (3d Cir. 2004).

### C. Standard of Review

If a state's highest court adjudicated a federal habeas claim on the merits, the federal court must review the claim under the deferential standard contained in 28 U.S.C. § 2254(d). Pursuant to 28 U.S.C. § 2254(d), federal habeas relief may only be granted if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or the state court's decision was an unreasonable determination of

---

[2]*Murray*, 477 U.S. at 496.

the facts based on the evidence adduced in the trial. 28 U.S.C. § 2254(d)(1) & (2); *see also Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001). A claim has been "adjudicated on the merits" for the purposes of 28 U.S.C. § 2254(d) if the state court decision finally resolves the claim on the basis of its substance, rather than on a procedural or some other ground. *See Thomas v. Horn*, 570 F.3d 105, 115 (3d Cir. 2009). The deferential standard of § 2254(d) applies even "when a state court's order is unaccompanied by an opinion explaining the reasons relief has been denied." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). As explained by the Supreme Court, "it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." *Id.* at 99.

Finally, when reviewing a habeas claim, a federal court must presume that the state court's determinations of factual issues are correct. *See* 28 U.S.C. § 2254(e)(1). This presumption of correctness applies to both explicit and implicit findings of fact, and is only rebutted by clear and convincing evidence to the contrary. *See* 28 U.S.C. § 2254(e)(1); *Campbell v. Vaughn*, 209 F.3d 280, 286 (3d Cir. 2000); *Miller-El v. Cockrell*, 537 U.S. 322, 341 (2003) (stating that the clear and convincing standard in § 2254(e)(1) applies to factual issues, whereas the unreasonable application standard of § 2254(d)(2) applies to factual decisions).

## III.   DISCUSSION

Petitioner asserts the following five Claims in his timely filed Petition: (1) the police violated his Fifth and Fourteenth Amendment rights by obtaining his video and

audio-recorded confession through coercive police interrogation and nullification of his *Miranda v. Arizona*, 384 U.S. 436 (1966) rights; (2) the State violated *Brady v. Maryland*, 373 U.S. 83, 87 (1963) by failing to provide the full content of the communication the police had with Petitioner following his arrest but prior to his recorded interrogation, and trial counsel provided ineffective assistance by failing to raise this claim on direct appeal; (3) the State violated *Brady* by failing to disclose the $10,000 reward expected by and provided to Bridgette Phillips in exchange for her cooperation and testimony, and trial counsel provided ineffective assistance by failing to raise this claim on direct appeal; (4) the State deprived Petitioner of a fair trial by presenting the perjured testimony of its ballistics expert Joseph Kopera, and trial counsel and post-conviction counsel provided ineffective assistance by failing to either discover or raise the issue of Kopera's perjury to the Delaware state courts; and (5) the cumulative effect of the aforementioned errors warrants habeas relief.

## A. Claim One: Involuntary Confession

In November 2000, Petitioner filed a motion to suppress his February 2000 videotaped statement to the Delaware State Police. The Superior Court denied the suppression motion after holding a pre-trial evidentiary hearing and determining that Petitioner's confession was admissible, explaining:

> The statement must be suppressed if it is a product of the police officers overbearing the will of the defendant not to give a statement, and in effect getting it out of him over his desire not to speak. And there are many cases cited that play on different aspects of what might be considered to overwhelm a defendant's will or not, but essentially it is a factual issue that is before the Court, namely whether this was a voluntary

statement given freely by the defendant having been informed of his rights.

Now, [Petitioner] was certainly informed of his rights in this case. He was informed at nine o'clock when he was first taken, first encountered at Troop 2 by the detectives, and then he was advised again shortly before the interview or as the interview started at 2:51 in the morning, and we don't know what he said at 9:00, but we do know at 2:51 a.m. he said that he understood each of the rights, and then he said that he wanted to go ahead and speak with the officers. One of the rights is the right to stop talking any time you feel like it during an interview. Again, [Petitioner] clearly understood that he had that right.

The interview in my view is a high- pressure interview. I don't have the basis of comparison that [the State] has or either of the officers do, but it does appear to me that there was pressure on [Petitioner]. But viewing the circumstances as a whole, I don't see that that pressure overbore his will with regard to making a statement. There is – it has been alleged that his request for a guarantee of protection was an inducement to it. I see that he is concerned or he at least, he says he is concerned about Swan in the statement; but the offer of protection was quickly made, it wasn't withheld depending upon whether [Petitioner] was going to make a statement or not, it was asked for and it was given, and it was the type of guarantee the State has always been in a position to give and ought to give to any person who feels threatened by someone else within the State's control. I do not see the offer of that guarantee as an unfair or unconstitutional inducement to further talk by [Petitioner].

The statements that were made later to [Petitioner] at different places, that you have to talk to us, you must talk to us, have to be understood in the context in which they were made. These were not statements that served to tell [Petitioner] that he didn't have a Constitutional right to remain silent. In the context of in which they were uttered they were saying that if you want us to consider your story, you have to tell us your story.

Now, the motives of police officers were to seek an incriminating statement. Well, that is their job. But that

mechanism is not unfair and in my view did not serve to overwhelm the will of the defendant. So considering the totality of the circumstances, I find [Petitioner] was fairly and properly advised of his *Miranda* rights, that he understood them, that based in part of his previous experience with those rights, and that while the interview that was conducted was in my view a high-pressure interview, it was of not such a nature that it overwhelmed any will on the part of the defendant not to make a statement. Therefore, the motion to suppress the statement will be denied.

(D.I. 52-1 at 187-190)  Petitioner challenged the denial of his suppression motion on direct appeal, arguing that he did not knowingly, voluntarily, and intelligently waive his *Miranda* rights.  More specifically, he asserted that "the police manipulated [his] fear of physical harm and pressured him to talk, when his many periods of silence during the interrogation indicated that [he] did not want to talk.  In addition, even if the initial interrogation was proper, [he] [] invoked his right to remain silent during the interrogation by asking to hear what Swan had said in his interrogation." *Norcross*, 816 A.2d at 762. The Delaware Supreme Court rejected Petitioner's argument, explaining:

> A suspect who is being subjected to a custodial interrogation has a Fifth Amendment right to remain silent and must be clearly informed of this and related rights before an interrogation begins.  The suspect may waive his/her rights. To be valid, however, the waiver must be knowing, voluntary and intelligent.  Based on the totality of the circumstances, the court must be satisfied that the waiver was "the product of a free and deliberate choice rather than intimidation, coercion or deception."  In other words, "[t]he question in each case is whether the defendant's will was overborne by official coercion when a statement was made."  Finally, under the Delaware constitution, if a suspect attempts to invoke *Miranda* rights during an interrogation, but does not do so unequivocally, the police must clarify the suspect's intention before continuing with the interrogation.

[Petitioner] points to several aspects of the interrogation that, he claims, were coercive. First, [Petitioner] repeatedly remained silent after being asked a question, but the police kept pushing him to talk, telling him that it would be in his best interest to set the record straight. Second, the police lied to [Petitioner], telling him that Swan had confessed and made [Petitioner] sound like the aggressor. In fact, Swan had refused to speak to the police. Finally, [Petitioner] claims that the police "manipulated" his fear of Swan to obtain a confession. This evidence, according to [Petitioner], demonstrates that his statement was not voluntary.

We find no basis in the record to overturn the trial court's determination that [Petitioner's] statement was voluntary. The Superior Court noted that it was a "high-pressure" interview, but concluded that [Petitioner] will was not overborne. The trial court found that: (i) [Petitioner] "clearly understood" his right to stop talking any time he wished; (ii) in telling [Petitioner] that he "had" to tell them what happened, the police officers were only "saying that if you want us to consider your story, you have to tell us your story...."; and (iii) the officers agreed to keep [Petitioner] and Swan separated as soon as [Petitioner] expressed concern for his safety, and did not use his fear of Swan to coerce [Petitioner's] confession. Based on these findings, which are supported by the record, we conclude that the trial court acted within its discretion in deciding that the statement was voluntary.

[Petitioner] raises an additional *Miranda* issue on appeal, based on the recent decision in *Draper v. State.* In *Draper,* the defendant repeatedly told the interrogating officer that he wanted to talk to his mother before talking to the police. This Court held that Draper's statement constituted an ambiguous invocation of his right to remain silent, requiring the police to clarify Draper's intent before proceeding with the interrogation. [Petitioner] argues that, by asking to hear what Swan had told the police, he equivocally invoked his right to remain silent.

We find no merit to this argument. [Petitioner] told the police, "I want to know what Swan said." He was told, in response, "We're not gonna sit here and tell you everything that Swan said." A moment later, [Petitioner] asked if he could hear the tape of Swan's statement. Again, he was told he could not.

14

> This brief colloquy cannot be interpreted as an ambiguous invocation of the right to remain silent. At no point did [Petitioner] say that he did not want to continue the interrogation, or that he wanted to hear Swan's statement before answering any additional questions. Accordingly, *Draper* is not applicable.

*Norcross*, 816 A.2d at 762–63 (Del. 2003), *overruled on other grounds by Rauf v. State*, 145 A.3d 430 (Del. 2016).

In Claim One, Petitioner contends that the police "engaged in multiple unethical means to extract a confession, including blatant lies about the evidence and the right to remain silent, and promises to protect [Petitioner] from credible threats of violence." (D.I. 51 at 8) He asserts that the "pervasive lying during the hours long interrogation contravenes *Miranda* [] and *Frazier v. Cupp*, 394 U.S. 731, 739 (1969)." (D.I. 63 at 4) Petitioner's basic argument is that, while "*Miranda* warnings are the starting point," the warnings were nullified by "what transpired during the [] three hours [after the police *Mirandized* Petitioner]." (D.I. 63 at 14)

The Delaware Supreme Court denied Claim One as meritless. Consequently, Petitioner will only be entitled to federal habeas relief if the Delaware Supreme Court's decision was contrary to, or an unreasonable application of, clearly established law. On collateral review, the issue of voluntariness is a legal question that is not entitled to the presumption of correctness afforded to a state court's factual findings. *See Miller v. Fenton*, 474 U.S. 104, 112 (1985). Instead, a court must examine the record and make an independent determination as to whether the state court's legal determination of voluntariness was contrary to, or an unreasonable application of, Supreme Court precedent. *See id.* ("the ultimate question whether, under totality of the circumstances,

the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination."); *see also Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002) ("[U]nder the AEDPA habeas standard, [a court is] required to determine whether the state court's legal determination of voluntariness was contrary to or an unreasonable application of Supreme Court precedent."). In contrast, state-court findings related to "subsidiary questions, such as the length and circumstances of the interrogation, the defendant's prior experience with the legal process, and familiarity with the *Miranda* warnings," are entitled to the presumption of factual correctness in § 2254. *Miller,* 474 U.S. at 117 (identifying the pre-1996 version of § 2254(d) as the applicable statutory section); *see also Sweet v. Tennis*, 386 F. App'x 342, 345 (3d Cir. 2010) (identifying § 2254(e)(1) as the appropriate statutory section). If the state court's "account of the evidence is plausible in light of the record viewed in its entirety, the [reviewing court] may not reverse it." *Anderson v. Bessemer City,* 470 U.S. 564, 573-74 (1985) (describing clearly-erroneous review generally).

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held, *inter alia*, that statements made by a defendant during a custodial interrogation must be suppressed unless he was informed of and waived his right to counsel or his right to remain silent. *See id*. at 477-79; *see Colorado v. Connelly*, 479 U.S. 157, 168 (1986). In order for a waiver of *Miranda* rights to be valid: (1) "the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception"; and (2) "the waiver must have

been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).

A confession, however, can be involuntary even if it is made after the defendant was advised of, and waived, his *Miranda* rights. A court determines if a confession was voluntarily made by evaluating the "totality of the circumstances surrounding the interrogation" to determine if the defendant made an uncoerced choice and had the requisite level of comprehension. *See Fare v. Michael C.*, 442 U.S. 707, 725 (1979); *Miller v. Fenton*, 796 F.2d 598, 604 (3d Cir. 1986). "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Connelly,* 479 U.S. at 167. "[C]oercion can be mental as well as physical." *Blackburn v. Alabama,* 361 U.S. 199, 206 (1960). When determining voluntariness under the totality of the circumstances standard, courts must consider a number of factors in addition to "the crucial element of police coercion," such as "the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, and mental health" and the failure of police to advise the defendant of his *Miranda* rights. *Withrow v. Williams,* 507 U.S. 680, 693–94 (1993); *see also Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973) (discussing factors). If a defendant was advised of his *Miranda* rights and voluntarily waived them, it will be difficult to claim that his confession was nonetheless involuntary. *See Missouri v. Seibert,* 542 U.S. 600, 609 (2004) (noting that "maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina"); *see also Berkemer,* 468 U.S. at

17

433 n. 20 ("[C]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare."). Notably, even if the government uses psychological tactics to obtain a statement from a suspect, a confession is still considered voluntary as long as the suspect's decision to confess is a "product of the suspect's own balancing of competing considerations." *Miller*, 796 F.2d at 604.

In this case, Petitioner does not deny that he was given a *Miranda* warning at the start of his interrogation, or that he agreed to speak with police without counsel after being so informed. Rather, Petitioner contends that the police engaged in pervasive lying and a number of coercive interrogation techniques which, when considered in context with the length of the interrogation (three hours), "nullified" the *Miranda* warning and his initial waiver of his *Miranda* rights. Petitioner identifies three lies told by the police, which he characterizes as improper coercive conduct. The first lie the police told was that Swan made a tape-recorded statement identifying Petitioner as the killer. In an attempt to demonstrate the coercive nature of the statements, Petitioner notes that the police "repeatedly" told this lie told over the three hour interrogation and increasingly added details to the story when Petitioner expressed skepticism. (D.I. 52 at 11-12) The second lie told by the police was that they, themselves, were not lying about Swan providing a statement, as evidenced by the fact that "they were recording the entire process." (D.I. 52 at 13) The third lie "literally contradicted the *Miranda* warning itself," because the officers advised Petitioner throughout the night "that remaining silent was

18

against his interest and the only way to advance his interest at a future trial was to make a statement about the crime and make it now." (D.I. 52 at 13) Petitioner contends that he was fearful of being harmed by his codefendant Swan, and the police promises of protection and leniency overbore his resistance to give a confession. (D.I. 14 at 19)

Petitioner also challenges the correctness of two factual findings by the Delaware state courts that are subsidiary to the legal determination of voluntariness: (1) the police did not use Petitioner's fear of Swan to coerce Petitioner's confession; and (2) that, "in telling [Petitioner] that he 'had' to tell them what happened, the police officers were only 'saying that if you want us to consider your story, you have to tell us your story." *Norcross*, 816 A.2d at 762. The Court will address these subsidiary factual challenges first.

As previously noted, the Superior Court conducted a pre-trial evidentiary hearing and, in concluding that Petitioner's confession was voluntary, determined that: (1) the police detectives' offer to protect Petitioner from Swan was not "an unfair or unconstitutional inducement of further talk by [Petitioner]"; and (2) the police statements made to Petitioner at different junctures of the interrogation – "you have to talk to us, you must talk to us" – when viewed "in the context in which they were made" did not "tell [Petitioner] that he didn't have a Constitutional right to remain silent. In the context . . . in which they were uttered they were saying that if you want us to consider your story, you have to tell us your story." (D.I. 14 at 622-26) The Superior Court found specifically that Petitioner's allegations that the police used his fear of Swan to coerce a confession and that the police violated *Miranda* by asserting it would be in his best interest to make

19

a statement were unsupported by the evidence. *Id.* When affirming the Superior Court's denial of Petitioner's suppression motion, the Delaware Supreme Court held that these factual findings were supported by the record. *See Norcross*, 816 A.2d at 763.

In the absence of clear and convincing evidence to the contrary, the Court must accept as correct the aforementioned factual findings. In his Reply to the State's Answer, Petitioner attempts to rebut the Delaware state courts' factual findings by stressing that: (1) Petitioner only asked for protection because the police detectives raised the subject of Swan's violent past (D.I. 63 at 12); and (2) the "trial court disregarded the impact of the police contradicting the initial *Miranda* warning repeatedly over three hours" (D.I. 63 at 15). These arguments do not amount to clear and convincing evidence sufficient to rebut the state courts' factual determinations, because the Delaware state courts' determinations are plausible. For instance, while the transcript of the interrogation shows that the police were the first to mention Swan's history of violence, when viewed in context, it is plausible to conclude that their initial reference to Swan's violent history was to communicate their belief that Swan was the killer, not Petitioner, and was not an attempt to "scare" him into confessing. The lie was utilized in an attempt to have Petitioner provide his version of what happened. In addition, to the extent Petitioner requested a guarantee of protection from Swan, the police officers responded immediately and informed Petitioner that protective custody would not be a problem. (D.I. 52-1 at 8) The officers did not withhold a promise of protection until Petitioner provided more information, nor did they rescind the offer of

20

protection during Petitioner's more reticent periods. Nothing about the officers' reaction to Petitioner's request for protection indicates that they were acting in a certain way to induce Petitioner to speak.

| | |
|---|---|
| Petitioner: | I've never hurt anybody. |
| Brown: | That's right. |
| Fraley: | But something happened. |
| Brown: | And that's one of those things. |
| Fraley: | And that's what we've got to talk about, [Petitioner]. This one went ugly. |
| Petitioner: | **I don't hurt people.** |
| Brown: | **I know you . . . And, and you don't have a past history of that. And we've checked into that. We know that.** |
| Fraley: | **[Swan] does. And I know you know that from his past. We know all about Houston, Texas and everything else with [Swan]. So you got to tell us what happened, [Petitioner]? I got a feeling your version's going to be a little bit more correct than what we got.** |
| Brown: | I mean, I, I can tell you right now I don't think that, ah, you guys went up there to do what, what happened. I think things got out of hand. And, and that's why, that's how it happened like it did. I don't think the initial, ah, the way it went down was the initial way it was planned to go down, |
| Petitioner: | **If I talked to you guys what kind of guarantees am I looking at?** |
| Fraley: | I can't sit here right now as a Detective, neither can my Sergeant, and tell you any guarantees. |

If I did I'd be lying to you. And I don't believe in lying to people.

Petitioner: **Do I get like D.A.'s, [] like protection and stuff like that? Or . . .**

Fraley: **What type of protection are you looking at?**

Petitioner: **Ah . . .**

Fraley: **From [Swan]?**

Petitioner: Ah, Swan's tied in with a lot of bad people.

Fraley: Well, it's like this, Delaware is a small state. There's three prisons in Delaware. **[] Being in different prisons there's no problem. I can sit here and tell you that. Um, protective custody, if that's what you want, I don't think that'll be a big problem.** I can sit here and tell you that on tape. But that's about all I can tell you.

Petitioner: **Ah, what I need is some guarantees from somebody.**

Fraley: What, what kind of, what are you talking about? I mean, well, you say he's tied-in, who's he tied-in with?

Petitioner: He's tied-in with a lot of, ah, Japanese gangs and stuff like that in Texas.

Fraley: Well, I can tell you right now, I'm from Kent County, Sergeant Brown in is in Sussex . ..

                    *                    *                    *

Fraley: … there is not a lot of Japanese . . .

                    *                    *                    *

Fraley: . . . or Orientals in . . .

Petitioner: He . . .

Fraley:        … the prisons down there.

Petitioner:    He is tied-in, trust me.

Brown:         Okay.

Fraley:        **We'll, we'll get you squared away [].**

Brown:         Well, let's, let's talk about that. Let's talk about the deal. How did you end up getting hooked up with him to begin with?

(D.I. 52-1 at 7-9)

Fraley:        Swan probably told you some things he did in, ah, Houston, Texas didn't he?

Petitioner:    No. Very little.

Fraley:        Well, he's bragged to other people I'll tell you that.

Petitioner:    Well, I, I mean, can you share?

Fraley:        Killed, that he alludes to either him or this gang killing someone else. Like I say, [], you don't have any violence on your record. Swan's got plenty. It's a burglary, which is your world, that went bad to Swan's.

Brown:         Right. Swan's world is the one where we go full bore into places, do robberies, slap people around, beat the shit out of em, and… And that's what he does. He did it down in Houston, Texas. You know that.

Fraley:        No. More than likely he probably . . .

Brown:         I mean, he might try to sit . . .

Fraley:        . . . told you about it.

23

Brown:    . . . over there in, when we were talking to him and you know, push all the incident off on you as being the aggressor, which I don't believe. But, you know . . .

Petitioner:    I'm a criminal not a killer.

Fraley:    You need to tell us a little bit more detail and prove to us that you're not a killer. Now Swan wants to go around shooting his mouth off about doing people in, ah, Texas. You just said you shot him with a 10 millimeter. Well, we know a 10 millimeter was used. And it was a Smith & Wesson, semi-automatic.

Petitioner:    I shot Swan with a, a, not a 10, you got it wrong, it was a 40.

Fraley:    Okay.

Brown:    Okay.

Petitioner:    And I would have kept shooting but it jammed.

Fraley:    Why did you shoot him? I mean, was it an accident or did you just . . .

Petitioner:    No. I just shot him _____ (too low). He was being a fucking ass.

Fraley:    How was he being an asshole? Had he already shot the boy?

Petitioner:    **How soon could I get somebody in here to give me some kind of like guarantees that I'm not gonna like fry because I'm talking to you guys?**

Fraley:    **Like you mean from Swan, is that what you mean?**

Petitioner:    **No. I mean, from, in general, from this.**

24

| Fraley: | You got to tell us what you know first, then we'll make a call for you. Okay? |
|---|---|
| Petitioner: | But you . . . |
| Fraley: | And so far you're only giving us a little bit at a time. [] we need the whole story. |
| Petitioner: | Oh, I know. |
| Fraley: | You've got to sit here and convince us that you're on the level. You could be sitting here lying to us. I don't know yet. You're giving me a little bit, and I'm very pleased with that. But you're not giving us all yet. And I know you know better []. Now you tell me why you shot Swan? I think I know, but I, I want to hear it from you. Maybe I'm completely wrong. |

(D.I. 52-1 at 19-21)          *          *          *

| Brown: | And it wasn't the way you thought it was gonna go down. And I can just sit here from listening to you and tell that . . . I don't believe you're, that was your idea to go in there, due to the fact that they were home, was it? |
|---|---|
| Petitioner: | As I said I don't, I don't go into places with people home. |

*          *          *

| Petitioner: | I know. You want to know why I shot Swan. |
|---|---|
| Fraley: | Yeah. |
| Petitioner: | _____ (too low) why I didn't kill him. |
| Fraley: | Uh huh. |
| Petitioner: | Well, obviously cause my, my pistol jammed. That's the only reason Swan's still alive. |

25

(D.I. 52-1 at 26-27) (emphasis added). In short, the quoted excerpts from the interrogation demonstrate the plausibility of the Delaware state courts' factual finding that the police officers' reference to Swan's violent history and promise of protection was not coercive.

The transcript of the interrogation also belies Petitioner's characterization of the police officers' statements that he "had" to tell them his story as overriding his *Miranda* right to remain silent. Petitioner focuses on the number of times the police officers made similar statements over the course of the three-hour long interrogation. (D.I. 63 at 15) However, when viewed in context with the transcript of the entire interrogation, it was plausible for the Superior Court to conclude that the police statements merely informed Petitioner that it would be in his best interest to cooperate. In addition, during the suppression hearing, the State noted that Petitioner had been *Mirandized* on two other occasions for different crimes, and that he invoked his right to remain silent for one of those offenses. (D.I. 52-1 at 158) In other words, Petitioner knew how to end the interrogation by invoking *Miranda*. Thus, the Court accepts as correct the Delaware state courts' factual determinations with respect to these two issues.

Having rejected as unfounded Petitioner's challenge to two of the state courts' factual findings, the Court must next consider the totality of the circumstances surrounding the interrogation to determine if Petitioner's confession was voluntary. The Court starts by reiterating that Petitioner does not deny that he was given a *Miranda* warning at the start of his interrogation, or that he agreed to speak with police after being so informed. Although a knowing and voluntary *Miranda* waiver does not

necessarily demonstrate that a subsequent confession was voluntary, it does show that Petitioner knew he had the right to remain silent yet still provided a statement to the police. *See Oregon v. Elstad*, 470 U.S. 298, 318 (1985) (acknowledging that suspect's choice to speak after receiving Miranda warnings is highly probative of voluntariness). Significantly, in this case, Petitioner had been *Mirandized* in the past for two other crimes, and he actually invoked his right to remain silent for one of those offenses --- a burglary in 1997. (D.I. 52-1 at 158)  Additionally, the two times the officers left the room during the course of Petitioner's interview, Petitioner asked to have them return so that he could share more information with them. (D.I. 52-1 at 107; 109-11)  These circumstances strongly suggest that Petitioner's will was not overborne by the police.

Nevertheless, Petitioner contends that the following factors rendered his confession involuntary: the length of the interrogation; the officers' exploitation of his nicotine addiction; the officers' coercive use of breaks during the interrogation; and the officers' repeated lies.  The Court will consider these factors *in seriatim*.

### 1. Length of interrogation

Petitioner was arrested in Delaware at 7:45 pm and placed in a holding cell at 8 p.m. (D.I. 52 at 10)  Swan was arrested in Maryland on the same day. *Id.*  Detective Fraley and Sergeants Brown and Rhodes entered Petitioner's holding cell, at which time Fraley advised Petitioner of his *Miranda* rights. *Id.*  Fraley told Petitioner that he and Brown were going to Maryland to talk to Swan and would return to talk to Petitioner later. *Id.*  Petitioner remained alone in the holding room for the next 4½ to 5 hours. (D.I. 52 at 11)  Fraley and Brown attempted to interview Swan in Maryland, but

Swan invoked his right to counsel and refused to talk. (D.I. 52 at 11) Brown and Fraley returned from Maryland and interrogated Petitioner from approximately 2:50 a.m. to 6:00 a.m.; the interrogation was recorded with a video camera and audio cassettes. (D.I. 52 at 11) The recorded interrogation began with Fraley advising Petitioner of his *Miranda* rights, and Petitioner agreed to talk with the officers. (D.I. 52 at 11) The actual interrogation lasted three hours and ten minutes, which, while not short, is not considered to be unduly lengthy. *See c.f., Davis v. North Carolina*, 384 U.S. 737, 739, 742, 746-47 (1966) (finding confession involuntary when defendant was interrogated daily for sixteen days); *see also Berghuis v. Thompkins*, 560 U.S. 370, 387 (2010) (noting that where interrogations of greater duration were found to be improper, "they were accompanied, as this one was not, by other facts indicating coercion, such as an incapacitated and sedated suspect, sleep and food deprivation, and threats").

## 2. Exploitation of nicotine addiction and coercive use of breaks

Petitioner admits that the police provided him with soda and cigarettes during the interrogation, but he contends that the police took advantage of his nicotine addiction to exert further pressure because they did not immediately provide him with cigarettes when he requested them. (D.I. 63 at 7-8 & n. 3) Petitioner also contends that the breaks from the interrogation "were themselves coercive," because he was not "released from custody or in any way removed from his lengthy isolation at the police barracks." (D.I. 63 at 8) The Court is not persuaded that these factors demonstrate that Petitioner suffered from a coercive deprivation that overcame his free will. Petitioner

first asked to smoke at 27:41 on the videotape counter, and began to smoke at 37:00, which amounts to a ten-minute delay. (D.I. 63 at 8 n. 3) In addition, the police provided Petitioner with a pack of cigarettes—from which Petitioner smoked four cigarettes during the course of the three hour long interview. (D.I. 52-1 at 29; 38; 51-52; 69; 82-83) Neither the ten-minute delay in providing the cigarettes nor the number of cigarettes smoked suggest that the police used the cigarettes to coerce Petitioner to confess.

Petitioner's contention that "the so-called 'breaks' were themselves coercive, because at all times [he] remained incommunicado in the police interrogation room," is similarly unpersuasive. (D.I. 63 at 8) The Court has identified five breaks that occurred during the interrogation: (1) an eleven minute restroom break at Petitioner's request (D.I. 52-1 at 51-52); (2) an unspecified but extremely brief seconds-long break when Fraley left to get a light for the cigarettes (D.I. 52-1 at 29); (3) an eight minute long break from 5:05 a.m. until 5:13 a.m. where Petitioner was alone in the interrogation room (D.I. 52-1 at 82-83); and (4) a nine minute break from 5:37 a.m. to 5:46 a.m. where Petitioner spoke with an unidentified person about a burn mark and also spoke with Fraley and Brown about protective custody, all of which was taped (D.I. 52-1 at 104-111). Although Petitioner uses the term "breaks" in the plural, he actually focuses on the period of time Petitioner was in the holding cell from 9 p.m. until around 2:51 a.m., stating that the "so-called" break in the holding cell was in fact a "component[] of the coercive method of interrogation." (D.I. 63 at 9) The Court does not view this extremely brief and vague reference to the holding cell portion of his *Miranda* custody as part of

29

the interrogation at issue in Claim One. By process of elimination, the only break where Petitioner was alone in the interrogation for more than a few seconds was the eight minute long break from 5:05 a.m. until 5:13 a.m.. As a result, the Court will address Petitioner's contention in relation to the eight-minute break.

Petitioner appears to assert that a suspect must be removed from an interrogation room and must not be incommunicado in order for a break to be a non-coercive factor in the voluntariness inquiry. The case he cites, *Maryland v. Shatzer*, 559 U.S. 98, 112-14 (2010), does not support that assertion,[3] and the Court has not found any caselaw articulating that particular requirement for breaks. Nevertheless, even if being incommunicado and alone in the interrogation room during the eight-minute long break from 5:05 a.m. to 5:13 a.m. did not remove the "inherently compelling pressure of custodial interrogation" in this situation, (D.I. 63 at 8), Petitioner had already provided his statement to the police before that break started. The remainder of the interrogation was focused on "clearing up" some of the facts. (D.I. 52-1 at 83) In sum, the Court cannot conclude that the break was itself coercive when considered in context with the fact that the entire interrogation was slightly more than three hours in length.

---

[3]The issue in *Shatzer* was whether and under what circumstances a break in *Miranda* custody and the passage of time terminate the presumption articulated in *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981) that once a suspect invokes the right to counsel, the police must immediately cease interrogation until counsel is present. The *Shatzer* Court held that the *Edwards* presumption does not apply if the suspect was released from *Miranda* custody after he asked for an attorney and at least fourteen days passed before the police initiated a re-interrogation. *See Shatzer*, 451 U.S. at 110.

### 3. Repeated lies

Petitioner contends that the police engaged in pervasive lying and a number of coercive interrogation techniques which, when considered in context with the length of the interrogation (three hours), "nullified" the *Miranda* warning and his initial waiver of his *Miranda* rights. Petitioner identifies three lies told by the police which he characterizes as coercive. The first lie the police told was that Swan made a tape-recorded statement identifying Petitioner as the killer. According to Petitioner, the police told this lie frequently over the three-hour long interrogation and increasingly added details to the story when Petitioner expressed skepticism. (D.I. 52 at 11-12) The second lie told by the police was that they did not believe in lying, and "that the proof that they were not liars is that they were recording the entire process." (D.I. 52 at 13) The third lie, in Petitioner's terms, "literally contradicted the *Miranda* warning itself," because the officers advised Petitioner throughout the night "that remaining silent was against his interest and the only way to advance his interest at a future trial was to make a statement about the crime and make it now." (D.I. 52 at 13) Petitioner contends that he was fearful of being harmed by his codefendant Swan, and the police promises of protection and leniency overbore his resistance to give a confession. (D.I. 14 at 19)

The Court has already accepted as presumptively correct the Delaware state courts' factual finding that the police officers' statements that it was in Petitioner's best interest to tell them his version of what happened did not contradict the *Miranda* warning. Consequently, at this juncture, the Court will consider the other two "lies" identified by Petitioner.

Although there is no precise definition of "coercive police activity," the Supreme Court has identified the following examples as constituting such: interrogating the defendant for four hours while incapacitated and sedated in intensive care unit; interrogating a medicated defendant for over eighteen hours without food or sleep; holding a gun to the head of a wounded defendant to extract a confession; interrogating a defendant for sixteen days in a closed cell without windows, limited food, and coercive tactics; and holding a defendant for four days with inadequate food and medical attention. *See Connelly,* 479 U.S. at 164 n. 1. However, there is a distinction between police trickery as a means of coercion and police trickery as mere strategic deception; "[p]loys to mislead a suspect or lull him into a false sense of security that do not rise to the level of compulsion or coercion to speak are not within *Miranda*'s concerns." *Illinois v. Perkins,* 496 U.S. 292, 297 (1990). In other words, a law enforcement agent may use some psychological tactics or even actively mislead a defendant in order to obtain a confession, provided that a rational decision remains possible. *See Frazier,* 394 U.S. at 739 (stating police misrepresentation that co-defendant had confessed did not render otherwise voluntary confession inadmissible). As a general rule, police can lie to a suspect about the extent of the evidence against the suspect or feign friendship with the suspect without fear of rendering the resulting confession involuntary. *See id.* at 731, 737–39. "Subtle pressures may be as telling as coarse and vulgar ones. The question is whether the accused was deprived of his free choice to admit, to deny, or to refuse to answer." *Garrity v. State of N.J.,* 385 U.S. 493, 496 (1967); *see also Schneckloth v. Bustamonte,* 412 U.S. 218, 226 (1973) (stating test for determining voluntariness of

confession is whether, in light of all surrounding circumstances, defendant's will was overborne).

Here, having already been advised of his *Miranda* rights, Petitioner was aware that any statements made would be used against him in a court of law. Although a knowing and voluntary *Miranda* waiver does not necessarily demonstrate that a subsequent confession was voluntary, it does show that Petitioner knew he had the right to remain silent, yet he still provided a statement. *See Elstad*, 470 U.S. at 318 (acknowledging that suspect's choice to speak after receiving Miranda warnings is highly probative of voluntariness). Consequently, the precise issue in this case is whether the remaining two police lies so seriously changed the circumstances such that Petitioner's answers were no longer voluntary, or Petitioner was no longer making a knowing and intelligent relinquishment of his rights. *See Wyrick v. Fields*, 459 U.S. 42, 47 (1982).

Reviewing the two lies identified by Petitioner within the context of the entire interrogation demonstrates that they did not amount to coercive police activity rendering Petitioner's statement involuntary. First, although the detectives deceived Petitioner by telling him that Swan had already confessed and placed the blame on him, that tactic is not unconstitutional. Such deception is "only relevant to the constitutional validity of a waiver if it deprives a defendant of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *Burbine*, 475 U.S. at 423-24. While a lie told to a detainee about an important aspect of a case "may affect the voluntariness of the confession, the effect of the lie must be analyzed in the context

of all the circumstances of circumstances of the interrogation." *See Miller*, 796 F.2d at

607. Petitioner was a mature individual of normal intelligence and a former marine,

(D.I.52-1 at 154-55), and while relevant, the fact that the police untruthfully stated that

Swan had implicated Petitioner does not demonstrate that Petitioner's freewill was

overborne. In fact, the two times the detectives left the room during the course of

Petitioner's interview, Petitioner asked to have them return so that he could share more

information with them. (D.I. 52-1 at 107; 109-11) These circumstances support the

conclusion that Petitioner's will was not overborne by the misrepresentation regarding

Swan's confession.

Petitioner's contention that the police coerced him into giving a statement by

professing their own honesty is also unavailing. While these statements may have been

ploys to lull Petitioner into a false sense of security, Petitioner has not demonstrated

that those statements impeded his ability to make a rational decision as to whether he

wanted to provide a statement to the police.

The conclusion that these two lies did not critically impair Petitioner's capacity for

self-determination is further illustrated when viewed in conjunction with the other

relevant factors to be considered under the totality of the circumstances test. Petitioner

was familiar with police questioning, as evidenced by his admission during the recorded

statement that he had only months earlier been arrested and convicted for the burglary

of an armory in Middletown. (D.I. 52-1 at 14-15) Petitioner also admitted to police that,

years earlier, he had been arrested and convicted of a burglary in Florida and was in

general, a burglar. (*Id.* at 13, 15, 27. Indeed, Petitioner stated, "I'll B&E all day ... I live

off the [a]drenalin rush .. .," and "I'm a criminal, not a killer." *Id.* at 15, 20, 36. Petitioner also acknowledged that, prior to the Florida burglary, he had been a United States Marine, from which he had been "booted out." *Id.* at 5. Police provided Petitioner with two cans of soda to drink, a pack of cigarettes—from which Petitioner smoked four cigarettes during the course of the interview, a break to use a restroom, and breaks when the detectives left the room and Petitioner remained alone. (D.I. 52-1 at 29; 38; 51-52; 69; 82-83) Finally, Petitioner was neither handcuffed nor shackled at any time during the interview, and the detectives did not so much as raise their voices when questioning Petitioner. (D.I. 52-1 at 155)

In sum, the Court considers the following circumstances relevant to the instant inquiry: Petitioner was *Mirandized*; he voluntarily gave up his *Miranda* rights; he never asked to stop interview and never asked to have an attorney present; he did not appear to be under the influence of anything; the detention length was not unusual; he was given soda to drink, cigarettes to smoke, and breaks from questioning; he was cooperative; and the record does not indicate that the interrogation techniques utilized by the police overbore Petitioner's will. Thus, the Delaware state courts' determination that Petitioner's incriminating recorded statement was voluntary was not contrary to, or an unreasonable application of, clearly established federal law; nor was it an unreasonable application of the facts. *See* 28 U.S.C. § 2254(d). Accordingly, the Court will deny Claim One as meritless.

## B. Claim Two: *Brady* Violation with Respect to Initial Contact Between Police and Petitioner

Petitioner was arrested at 7:45 pm and placed in a holding cell at 8 p.m. (D.I. 52 at 10) Detective Fraley and Sergeants Brown and Rhodes entered Petitioner's holding cell sometime around 9 p.m., at which time Fraley advised Petitioner of his *Miranda* rights. *Id.* Fraley told Petitioner that he and Brown were going to Maryland to talk to Swan and would return to talk to Petitioner later. *Id.* During the trial, Fraley testified that he did not conduct any questioning at this time. (D.I. 52 at 28) Brown testified that he and Fraley spoke with Petitioner for not much longer than five minutes, and that they told Petitioner what they "were going to do." *Id.* The police officers did not formally begin to interrogate Petitioner until 2:50 a.m., approximately seven hours later.

In Claim Two, Petitioner contends that the State violated *Brady v. Maryland* by failing to provide the full content of the communication between Brown, Fraley, and Petitioner while Petitioner was in the holding cell. According to Petitioner, "the videotape of the interrogation shows that, in fact, before Fraley and Brown left for Maryland, Fraley and/or Brown told [Petitioner] that he would need to some 'damage control.' While nothing more has surfaced about the content of this earlier conversation, the evidence in the record that there was a discussion of 'damage control' raises a strong inference that the officers testified falsely regarding the scope of that unrecorded conversation." (D.I. 52 at 28)

Petitioner concedes that his *Brady* argument in Claim Two is procedurally defaulted because he did not present it to the Delaware Supreme Court on direct appeal. (D.I. 63 at 16) As a result, the Court can only review the Claim if Petitioner

36

demonstrates cause for his default and actual prejudice therefrom, or that a

fundamental miscarriage of justice will occur if the Court does not review his Claim.

Citing *Martinez v. Ryan*, 566 U.S. 1 (2012),[4] Petitioner asserts that trial counsel's failure

to raise the *Brady* argument during the criminal proceeding and on direct appeal, and

post-conviction counsel's failure to raise on state collateral review both the *Brady*

argument and the issue of trial counsel's related ineffective assistance "constitute cause

and therefore excuses the default." (D.I. 52 at 32; D.I. 63 at 16)  The Court rejects this

argument.  The explicit and main argument in Claim Two is that the State violated

*Brady*, and Petitioner only mentions the issue of both trial and post-conviction counsels'

ineffective assistance as a roundabout method to establish cause for his default of his

underlying *Brady* argument.[5]  (D.I. 52 at 32 ¶ 102)  As Petitioner himself recognizes in

---

[4]In *Martinez v. Ryan*, 566 U.S. 1, 16–17 (2012), the Supreme Court held that
inadequate assistance of counsel during an initial-review state collateral proceeding
may establish cause for a petitioner's procedural default of a claim of ineffective
assistance of trial counsel.  In order to obtain relief under *Martinez*, a petitioner must
demonstrate that: (1) the state post-conviction attorney in his first state collateral
proceeding was ineffective under the standards established in *Strickland*; (2) that the
underlying ineffective assistance of trial counsel claim is substantial; and (3) that
petitioner was prejudiced.  *See id.* at 9–10, 16–17.  To show that a claim is "substantial"
under *Martinez*, a petitioner must point to evidence demonstrating that the underlying
ineffectiveness claim has "some merit."  *Martinez*, 566 U.S. at 14.  That is, the petitioner
must submit at least *some* evidence tending to show (a) that trial counsel performed
deficiently in handling some aspect of pretrial or trial duties and (b) that the deficient
performance harmed the defense, which is defined as a reasonable probability of a
different outcome at trial.  *See Strickland v. Washington*, 466 U.S. 668, 695-96 (1984).
"[W]hether a claim is 'substantial' is a 'threshold inquiry' that 'does not require full
consideration of the factual or legal bases adduced in support of the claims.'"  *Bey v.
Sup't Greene SCI*, 856 F.3d 230, 238 (3d Cir. 2017).

[5]For example, Petitioner asserts: "This [*Brady*] claim was not raised in state court.
However, the failure to raise this claim was the result of ineffective assistance of prior
counsel."  (D.I. 52 at 32 ¶ 102)  In addition, Petitioner's presentation of the *Brady*
argument in Claim Two consists of seventeen paragraphs.  (D.I. 52 at 28-33)  Only one

his Reply to Claim Three, the *Martinez* Court "limited the use of ineffective assistance of state post-conviction counsel as 'cause' to underlying claims of ineffective assistance of trial counsel." (D.I. 63 at 25); *see also Abdur'Rahman v. Carpenter*, 805 F.3d 710, 714 (6th Cir. 2015) ("Even if we were to . . . analyze Adur'Rahman's underlying claims for *Brady* violations and prosecutorial misconduct, *Martinez* would not apply to those claims . . . "). Consequently, the Court will not address Petitioner's attempt to establish cause under *Martinez*.

In any event, *Brady* claims themselves provide an exception to the procedural default doctrine. In *Banks v. Dretke*, 540 U.S. 668 (2004), the Supreme Court opined that two of the three elements of a substantive *Brady* claim mirror the cause and prejudice inquiry for a procedural default, and proof of one is necessarily proof of the other. *Id.* at 691. A petitioner establishes a *Brady v. Maryland* violation by showing that: (1) the evidence at issue was favorable to the accused, either because it was exculpatory or it had impeachment value: (2) the prosecution suppressed the evidence,

---

paragraph consisting of three sentences asserts that trial counsel provided ineffective assistance by failing to raise what he alleges were *Brady* violations "to the attention of the jury" and/or by not "demand[ing] further discovery of notes or other memorialization of the unrecorded conversation." (D.I. 52 at 32 ¶ 103) Another paragraph consisting of three sentences asserts the ineffective assistance of post-conviction counsel in an attempt to establish cause for failing to present on collateral review an ineffective assistance of trial counsel claim. (D.I. 52 at 32 ¶ 104)

In contrast, in Claim Three, Petitioner explicitly asserts both a *Brady* argument and a free-standing ineffective assistance of trial counsel argument and attempts to establish cause for the default of both arguments by relying on post-conviction counsel's ineffective assistance in failing to raise the issue of trial counsel's alleged ineffective assistance. *See infra* at Section C. The difference in Petitioner's presentation of his ineffective assistance of counsel claims supports the Court's instant summary conclusion that Petitioner cannot utilize *Martinez* to establish cause for his procedural default of the substantive *Brady* argument in Claim Two.

either willfully or inadvertently; and (3) the evidence was material. *See Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *Lambert v. Blackwell*, 387 F.3d 210, 252 (3d Cir. 2004). A petitioner demonstrates materiality of the suppressed evidence by showing a "reasonable probability of a different result," which requires a showing that the suppressed evidence "undermines confidence in the outcome of the trial." *Kyles v. Whitley*, 514 U.S. 419,434(1995); *see also United States v. Reyeros*, 537 F.3d 270, 281 (3d Cir. 2008) (explaining that materiality requires "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."). The method for excusing a procedural default is by demonstrating "cause and prejudice" and, within the context of a *Brady* claim, the suppression of evidence by the State would be adequate "cause," while the non-disclosure of "material" evidence would prejudice the petitioner. "Thus, if [the petitioner] succeeds in demonstrating 'cause and prejudice,' he will at the same time succeed in establishing the elements of his [*Brady*] due process claims." *Banks*, 540 U.S. at 691.

Even under *Brady* there are limits to the State's duty of disclosure. For instance, the prosecution does not have a *Brady* obligation to make a complete and detailed accounting to the defense of all police investigatory work or information that is preliminary, challenged, or speculative. *See United States v. Agurs*, 427 U.S. 97, 109 (1976); *Giles v. Maryland*, 386 U.S. 66, 98 (1967) (Fortas, J. concurring). "The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of trial, [also] does not establish materiality in the constitutional sense." *Agurs*, 427 U.S. at 109-110. In addition, "*Brady* does

not create an affirmative obligation on the government to find evidence that may be exculpatory for defendant's use,"[6] and the government is not obligated "'to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself.'" *United States v. Pelullo*, 399 F.3d 197, 213 (3d Cir. 2005), *as amended* (Mar. 8, 2005). More specifically, "[e]vidence is not considered to be suppressed if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. Perdomo*, 929 F.2d 967, 973 (3d Cir. 1991).

Applying the aforementioned rationale from *Pelullo* and *Perdomo* to the instant case, the Court cannot conclude that the State suppressed information regarding the "undisclosed conversation" among Petitioner, Fraley, and Brown. Petitioner had access to his recorded interrogation prior to trial and could have asked relevant questions on the issue of the non-disclosed conversation at trial. *See Dennis v. Sec'y Penn. Dep't Corrs.*, 834 F.3d 263, 292 (3d Cir. 2016) ("We also got it right in *Pelullo* when we rejected defendant's argument that certain documents were *Brady* material and somehow 'suppressed' when the government had made the materials available for inspection."). Petitioner blames trial counsel for not pursuing this issue via discovery motions or cross-examination. Petitioner, however, does not explain why, even though he was a participant in the holding cell conversation and should know at least some of the basic content of what his present counsel refers to as the "undisclosed conversation," nothing in the Amended Petition or Reply presents Petitioner's version of

---

[6]*United States v. Walton*, 430 F. App'x 141, 148 (3d Cir. 2011).

the "undisclosed conversation" or even remotely suggests that Petitioner remembers the "undisclosed conversation" any differently.

Petitioner correctly notes that the Third Circuit has opined that "[t]he assumption that a defendant has access to his own confession or statement overlooks both the possibility that a defendant may not have total recall of what he said to the police, especially if the statement was made under pressured circumstances, and the reality that a defendant cannot, absent disclosure, know what the authorities recorded or retained of what he said." *Gov't of Virgin Islands v. Martinez*, 780 F.2d 302, 309 (3d Cir. 1985). Yet, while Petitioner may not have "total recall" of the "undisclosed conversation," Petitioner does not even make the simple assertion that his recollection of the "undisclosed conversation" differs from the officers' description of that conversation. Information about the "undisclosed conversation" was a piece of evidence that the defense would have been able to obtain without cooperation from the State, since Petitioner was a participant in the conversation. Given these circumstances, Petitioner cannot demonstrate that the State suppressed the "undisclosed conversation."

Petitioner also cannot demonstrate that, to the extent the "undisclosed conversation" even existed, it was exculpatory, material, or impeaching. He speculates that a conversation occurred between him, Fraley, and Brown while he was in the holding cell because one of the officers told Petitioner he would need to do "damage control," and "that's what I said earlier and I'll say it again, you have to do damage. control. You got to try to fix things." (D.I. 53 at 28-29) Petitioner argues that, "[w]hile

41

nothing more has surfaced about the content of this earlier conversation, the evidence in the record that there was a discussion of 'damage control' raises a strong inference that the officers testified falsely regarding the scope of that unrecorded conversation." (D.I. 52 at 28) The record, however, belies Petitioner's inference of false testimony and his belief that the "undisclosed conversation" was more extensive than portrayed by the police. The transcript of the interrogation reveals that the police exercised great care when interviewing Petitioner, which would also suggest that they would have exercised great care in memorializing the content of the "undisclosed conversation" if, indeed, such a conversation occurred. For instance, during the interrogation the officers explicitly identified when they stopped recording during a break or to replace the tape, and they clarified that they did not have off-tape discussions with Petitioner during those breaks. (D.I. 52-1 at 25) When there were silences on the tape, the officers noted that no one was speaking. (D.I. 52-1 at 24-26, 29) And, they left the tape recording during a break when someone else remained in the interrogation room with Petitioner. In other words, there is more concrete evidence of the officers' responsible interrogation techniques than evidence of Petitioner's unsupported belief that the "undisclosed conversation" contained impeachment or exculpatory material. Consequently, Petitioner's speculative assertion is insufficient to demonstrate that the "undisclosed conversation" constituted *Brady* material. *See United States v. Lynch*, 735 F. App'x 780, 792 (3d Cir. 2018) ("Lynch's unsupported belief that such exculpatory material may be found in the SAR is insufficient, as we think it unwise to infer the existence of *Brady* material based upon speculation alone.")

In short, Petitioner has not established cause for, or prejudice from, his default of Claim Two. The miscarriage of justice exception also does not excuse Petitioner's default, because he has not provided new reliable evidence of his actual innocence. For these reasons, the Court will deny Claim Two as procedurally barred from federal habeas review.

### C. Claim Three: *Brady* Violation with Respect to Impeachment Evidence Concerning Bridgette Phillips and Ineffective Assistance of Trial Counsel for Failing to Pursue *Brady* Violation

Petitioner's estranged wife, Bridgette Phillips, was one of the State's key witnesses at trial. The State acknowledged in its opening statement that Phillips gave the investigators the first break in the case when she emailed the Delaware State Police and advised it that she had information about a murder. (D.I. 14-45 at 252) During the trial, Phillips testified that she had overheard a boisterous conversation between Petitioner and Swan, and that afterwards, Petitioner described the alleged crime to her in significant detail, including that the victim was shot "pretty much point blank" and that he wouldn't have been shot "if he hadn't tried to play hero." (D.I. 15 at 539-544) Petitioner allegedly told Phillips on another occasion that the crime did not have any political overtones, but that it was simply "just a botched robbery." (D.I. 15 at 548-549)

After Warren's murder, the uncle of Warren's wife offered a $10,000 reward for information concerning the murder, and information regarding the reward was posted on the Delaware State Police website. *See State v. Swan*, 2010 WL 1493122, at *6 (Del. Super. Ct. Apr. 8, 2010). During cross-examination, trial counsel asked Petitioner if she knew about potential rewards. Phillips testified that she was aware that certain rewards

had been offered in connection with the homicide, but that she had not applied for any of them. (D.I. 15 at 611) The following interaction occurred between Phillips and trial counsel:

> Q: Now, you're aware that there have been rewards offered from time to time by certain organizations?
>
> A: Correct.
>
> Q: Have you put in any application for any of those rewards?
>
> A: I have not.
>
> Q: Anyone talked to you about them?
>
> A: One was mentioned but I was given no promise and nothing was ever said, simply the fact that there was a reward for it, and this was after all of my interviews.
>
> Q: Well, the fact remains that the discussion was had, right?
>
> A: Certainly.

(D.I. 15 at 611) Phillips received a $10,000 reward in October, 2001, a few months after her May 2, 2001 testimony in Petitioner's trial. (D.I. 52 at 35)

In Claim Three, Petitioner asserts two arguments. First, he contends that the State violated *Brady* by failing to disclose that Phillips cooperated and testified because she expected and received a $10,000 reward. (D.I. 52 at 34) Second, he asserts a free-standing ineffective assistance of trial counsel claim premised on the alleged *Brady* violation, stating: "Alternatively, trial counsel was ineffective for failing to further explore Ms. Phillips' answers regarding the issue of a reward with additional cross-examination." (D.I. 52 at 40)

44

The parties acknowledge that both the substantive *Brady* argument and the related ineffective assistance of trial counsel claim are procedurally defaulted. The *Brady* argument is defaulted because it was not presented to the Delaware Supreme Court on direct appeal. Petitioner included the *Brady* argument in his Rule 61 motion, but the Superior Court denied the argument as procedurally barred under Rule 61(i)(3) due to Petitioner's failure to raise it on direct appeal and his subsequent failure to demonstrate cause and prejudice. *See Norcross*, 2010 WL 1493120, at *9. Thereafter, Petitioner did not present the *Brady* argument to the Delaware Supreme Court on post-conviction appeal.

Petitioner's contention that trial counsel was ineffective for not exploring Phillips' answers regarding the issue of a reward with additional cross-examination is also defaulted, because Petitioner did not raise the argument in his Rule 61 motion or on post-conviction appeal. Therefore, the Court cannot review the merits of either sub-argument unless Petitioner establishes cause for and prejudice resulting from his default, or that a miscarriage of justice will occur if the Court does not review their merits.

### 1. *Brady* violation

Citing *Banks*, Petitioner asserts that there "is cause for and prejudice from the default [of the *Brady* argument]" because the State suppressed the evidence of the $10,000 reward to Phillips, and the reward evidence was both impeaching and material. As previously explained, Petitioner can demonstrate cause for his default of a *Brady* claim by demonstrating that the State suppressed evidence and prejudice from the

45

default by demonstrating the suppressed evidence was material. Here, however, Petitioner has not satisfied this burden, because he cannot demonstrate that the State suppressed information about the reward.

First, Petitioner does not assert that he was denied any requested information about the reward, and the fact that trial counsel actually asked Phillips about the reward on cross-examination demonstrates the defense was aware of the existence of a reward. Second, although Phillips received a $10,000 reward in October 2001, months after Petitioner's trial, the record demonstrates that Phillips' testimony was not induced by the hope or promise of receiving that award. Phillips testified she did not know about any possible reward when she initially came forward to the police and gave her statement and, at the time of her trial testimony on May 2, 2001, Phillips had not made any attempt to claim any reward. (D.I. 15 at 611-612) In fact, the private sponsor of the reward testified at Swan's trial in June 2001 that no one had inquired about the reward and that the reward was still available. (D.I. 55-2 at 5) Finally, the State prosecutor in Petitioner's trial did not provide Phillips with the contact information for obtaining the reward via a letter until July 2001, a few months after the conclusion of both Petitioner's and Swan's trials. Significantly, the State prosecutor provided this information to Phillips at the request of the Superior Court, and Petitioner's counsel was copied on this correspondence. (D.I. 52 at 39-40; D.I. 55 at 30; D.I. 55-3 at 1-2)

Further, the record demonstrates that Phillips' motivation for initially contacting the police and testifying was fear, not the promise of receiving a monetary reward. Phillips testified that she came forward because she had previously been threatened by

46

Petitioner and she "was tired of being scared . . . of [Petitioner] and Swan." (D.I. 15 at 552, 582-83) In fact, Phillips was so afraid of Petitioner and Swan that, just prior to contacting the police, she erroneously thought she saw Swan near her home in Canada and panicked. (D.I. 15 at 618-19)

Given the foregoing record, the Court cannot conclude that the State suppressed information regarding the $10,000 reward. Given the failure to demonstrate the actual suppression of evidence, Petitioner cannot establish cause and prejudice for his default of the underlying *Brady* argument. Petitioner's default also cannot be excused under the miscarriage of justice exception, because he has not provided new reliable evidence of his actual innocence. For these reasons, the Court will deny the substantive *Brady* argument in Clam Three as procedurally barred.

### 2. Ineffective assistance of trial counsel

Petitioner also asserts that trial counsel was "ineffective for failing to further explore Ms. Phillips' answers regarding the issue of a reward with additional cross-examination." (D.I. 52 at 40) Petitioner then contends that his procedural default of the *Brady* claim should be excused under *Martinez v. Ryan* because trial counsel was ineffective for inadequately cross-examining Phillips about the reward, and post-conviction counsel failed to pursue the ineffective assistance of trial counsel argument in the Rule 61 proceeding. More specifically, Petitioner contends:

> To the extent that this claim of ineffective assistance of trial counsel was not presented to the Delaware Courts, and the claim is or will be subject to a claim of state procedural bar, Petitioner explicitly pleads ineffective assistance of state post-conviction counsel as cause for the procedural bar as to the

ineffective assistance of trial counsel claim, pursuant to *Martinez v. Ryan*.

(D.I. 52 at 40) Petitioner argues that post-conviction counsel's failure to raise the issue of trial counsel's ineffectiveness in his Rule 61 proceeding constitutes cause because the ineffective assistance of trial counsel claim is "substantial." (D.I. 52 at 41) In his words:

> After all, state post-conviction counsel raised the underlying *Brady* claim as a substantive due process violation. To the extent to which trial counsel failed to make additional effort to learn of this bargained-for exchange, it fell below an objective standard of reasonableness. There could be no strategic reason for state post-conviction counsel to pursue the substantive due process claim but not a related ineffective assistance of counsel claim.

(D.I. 52 at 41)

The clearly established Supreme Court precedent governing ineffective assistance of counsel claims is the two-pronged standard enunciated by *Strickland v. Washington*, 466 U.S. 668 (1984) and its progeny. *See Wiggins v. Smith*, 539 U.S. 510 (2003). Under the first *Strickland* prong, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness," with reasonableness being judged under professional norms prevailing at the time counsel rendered assistance. *Strickland*, 466 U.S. at 688. Under the second *Strickland* prong, a petitioner must demonstrate "there is a reasonable probability that, but for counsel's error the result would have been different." *Id.* at 687-96. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Id.* at 688.

48

In order to sustain an ineffective assistance of counsel claim, a petitioner must make concrete allegations of actual prejudice and substantiate them or risk summary dismissal. *See Wells v. Petsock*, 941 F.2d 253, 259-60 (3d Cir. 1991); *Dooley v. Petsock*, 816 F.2d 885, 891-92 (3d Cir. 1987). Although not insurmountable, the *Strickland* standard is highly demanding and leads to a "strong presumption that the representation was professionally reasonable." *Strickland*, 466 U.S. at 689.

After reviewing the record, the Court concludes that post-conviction counsel's failure to raise the issue of trial counsel's failure to pursue the *Brady* argument in Claim Three cannot constitute cause for the default of the ineffective assistance of trial counsel claim, because the ineffective assistance of trial counsel allegation is not substantial. Trial counsel was aware of the possibility of the reward and questioned Phillips about it, exposing Phillips' possible reward-motivated bias to the jury. Given Phillips' explanation that she was not aware of the reward when she initially contacted the police, and the evidence showing that Petitioner did not seek out the reward until sometime after July 2001 and after the conclusion of Petitioner's trial, trial counsel's decision to forego pursuing the issue during the trial was both reasonable and non-prejudicial. In turn, since trial counsel was not ineffective for failing to raise the substantive *Brady* claim, post-conviction counsel's failure to raise the issue of trial counsel's ineffectiveness in the Rule 61 proceeding did not constitute ineffective assistance.

In the absence of cause, the Court does not need to address the issue of prejudice. Additionally, Petitioner's default cannot be excused under the miscarriage of

justice exception because he has not presented new reliable evidence of his actual innocence. Accordingly, the Court will deny Claim Three in its entirety for being procedurally barred.

### D. Claim Four: *Brady* Violation due to Ballistics Expert's Lack of Credentials and Related Ineffective Assistance of Trial Counsel

During Petitioner's trial, ballistics expert Joseph Kopera testified that Warren was shot four times with two different types of guns: a .357 caliber gun and a .40 caliber gun. (D.I. 52 at 42; D.I. 55 at 32) Warren "was shot twice in the back, once on the left side of his head behind the left ear, and once through the top of his head. The fourth bullet, fired from a gun barrel held tightly against the top of his head, had traveled through the skull down into the back of his neck, killing him instantly." *Swan v. State*, 28 A.3d 362, 366 (Del. 2011), *overruled on other grounds by Rauf v. State*, 145 A.3d 430 (Del. 2016). "Examination of the bullets removed from Kenneth Warren's body revealed that the two back wounds were made by .357 caliber bullets and the fatal wound was made by a 10mm/.40 Smith & Wesson caliber triple copper jacketed bullet." *Norcross*, 36 A.3d at 760.

Kopera had been with the "Maryland State Police for 15 years, and prior to that, he spent 21 years with the Baltimore City Police, [and he had] testified as an expert in the area of firearms in the courts of the State of Maryland, all the counties in the states of Delaware, Virginia, and Pennsylvania, and federal courts here in the United States." *Smith v. State*, 2019 WL 290025, at *3 (Md. App. Jan. 2, 2019). In Petitioner's trial, Kopera stated he had a mechanical engineering degree from the University of Maryland and an aerospace engineering degree from Rochester Institute of Technology. (D.I. 52

50

at 42)  However, in 2007, several years after Petitioner's trial, news of Kopera's falsification of his credentials and training came to light.  (D.I. 55 at 32)  It was discovered that Kopera did not have any college degrees, and the University of Maryland's transcript in his personnel file was a forgery.  (D.I. 52 at 42); *see also Kulbicki v. State*, 53 A.3d 361, 371 (Md. App. 2012)  Kopera committed suicide after his falsified credentials were revealed. (D.I. 52 at 42)

In Claim Four, Petitioner asserts that the State committed a *Brady* violation by "withholding from him and his counsel material impeachment evidence" that the State's ballistics expert Kopera lied about his credentials.  (D.I. 52 at 42; D.I. 63 at 26) Petitioner contends: "Had the jury known that the prosecution's key ballistics expert was a liar without a college education who had perjured himself for years, there is a reasonable likelihood that the jury would have rejected the testimony in its entirety." (D.I. 52 at 44)  Petitioner also asserts that trial and post-conviction counsel provided ineffective assistance for not discovering Kopera's perjury and pursuing relief on the basis of that perjury.  (D.I. 52 at 45)  Both Parties agree that the sub-arguments in Claim Four are unexhausted and procedurally defaulted. (D.I. 55 at 31; D.I. 63 at 26)

### 1.  *Brady* violation involving Kopera's lack of credentials

Petitioner seeks to invoke *Martinez* to excuse the procedural default of the underlying *Brady* by claim by asserting trial counsel were ineffective for failing to uncover the fact that Kopera lied about his credentials, and then asserting that post-conviction counsel were ineffective for failing to raise the ineffective assistance of trial counsel claim on collateral review. (D.I. 45)  *Martinez* cannot be utilized to establish

cause for the procedural default of an ineffective assistance of trial counsel claim that is asserted as cause for the procedural default of the underlying *Brady* claim. However, as previously explained, Petitioner can demonstrate cause for his default by demonstrating that the State suppressed evidence and prejudice from the default by demonstrating the State suppressed impeaching or exculpatory evidence that was material.

Here, Petitioner cannot demonstrate cause and prejudice because he cannot demonstrate that the Kopera's perjury constituted material impeachment evidence. Although Kopera did not have engineering degrees, "he was qualified as a firearms examiner because he had extensive on-the-job training and years of experience." *Smith*, 2019 WL 290025, at *4. As noted in one of the Maryland cases concerning the effect of Kopera's false credentials on a defendant's conviction, "ballistics is field for which no college degree is offered, and the expertise for the field is usually based on experience, which Kopera had in copious amounts." *Kulbicki*, 53 A.3d at 382.

Additionally, even if, as Petitioner argues, the jury would have discredited Kopera's testimony in its entirety if informed of Kopera's perjury, (D.I. 52 at 44), Petitioner cannot demonstrate a reasonable probability that disclosure of Kopera's perjury would have led to a different result. Petitioner characterizes Kopera's testimony regarding the two different bullets as "one of the central pieces of the prosecution's case against [Petitioner]" because it "matched the State's theory that Petitioner fired the fatal shot with the .40 gun while Swan shot Mr. Warren with the .357." (D.I. 52 at 42) There was, however, other substantial evidence supporting the ballistics evidence that Warren

was shot by two different guns and supporting the jury's guilty verdict. In his recorded statement to the police, Petitioner stated that he was armed with and used his .40 caliber gun at the homicide. (D.I. 52-1 at 17, 20, 63, 73, 75, 77) Petitioner stated that Swan shot Warren repeatedly with a revolver. (D.I. 52-1 at 70, 75) Petitioner explained that his .40 had jammed so Swan grabbed the .40 from Petitioner, shot the victim again, and then gave the .40 back to Petitioner. (D.I. 52-1 at 58-59, 88) Petitioner told the police that, prior to the homicide, Swan probably stole the guns from a house in Middletown, where Petitioner had been staying. (D.I. 52-1 at 79-80) Petitioner based this theory on the fact that police had questioned him about a theft of guns from his former roommates' house. (D.I. 52-1 at 79-80)

Other witnesses also testified that there were two different guns. Tina Warren testified that both intruders had weapons and fired both weapons. (D.I. 14-5 at 168-169) Matthew Howell testified that Petitioner told him that both he and Swan were armed and fired at Warren. (D.I. 15 at 171-174) Gina Ruberto testified that Petitioner told her two different guns were fired at the crime scene. (D.I. 15 at 296-298) Bridgette Phillips testified that Petitioner informed her he shot Warren after the victim shot Swan. (D.I. 15 at 543-544, 579) Dr. Tobin, who performed Warrant's autopsy, testified that she retrieved two different sized bullets from Warren's body. (D.I. 15-2 at 21-22, 81-88) In short, even if the defense and the jury had been informed about Kopera's perjury and he had been discredited, there was substantial other evidence that two different guns with two different bullet calibers were used to shoot Warren. The existence of other substantial evidence that there were two guns precludes Petitioner from establishing a

reasonable probability that the outcome of his trial would have been different had Koper's perjury been exposed. Petitioner's failure to demonstrate that Kopera's perjury constituted material impeaching evidence means that he cannot establish cause and prejudice for his default of the instant *Brady* Claim. In addition, Petitioner's failure to provide new reliable evidence of his actual innocence prevents the Court from excusing his default of the *Brady* argument in Claim Four to prevent a miscarriage of justice.

### 2. Ineffective assistance of trial and post-conviction counsel

Petitioner asserts that trial and post-conviction counsel provided ineffective assistance in how they handled the issue of Kopera's perjury. First, he contends that trial counsel were ineffective for failing to investigate or challenge Kopera's academic credentials. Second, he contends that post-conviction counsel provided ineffective assistance because they were informed of Kopera's perjury during his Rule 61 evidentiary hearing in March 22, 2007 but did not raise a *Brady* claim or an ineffective assistance of trial counsel claim after receiving that information. (D.I. 52 at 45) Since both of these ineffective assistance of counsel arguments are procedurally defaulted, the Court cannot review the arguments on the merits unless Petitioner demonstrates cause and prejudice, and a miscarriage of justice.

Relying on *Martinez*, Petitioner asserts that post-conviction counsel's failure to pursue the ineffective assistance of trial claim in his Rule 61 proceeding constitutes cause for the procedural default of his ineffective assistance of trial counsel claim. Once again, Petitioner's reliance on *Martinez* is unavailing. It is well-settled that an attorney's failure to raise meritless objections or arguments does not constitute

ineffective assistance. *See United States v. Sanders*, 165 F.3d 248, 253 (3d Cir. 1999). The Court has already determined that the underlying *Brady* argument in Claim Four lacks merit because Kopera's perjury did not satisfy the materiality requirement under *Brady*. Since the underlying *Brady* argument lacks merit, Petitioner's ineffective assistance of trial counsel argument is not substantial. Therefore, *Martinez* cannot be utilized to excuse post-conviction counsel's default of the ineffective assistance of trial counsel claim.

Petitioner's contention that post-conviction counsel provided ineffective assistance by failing to raise an independent *Brady* claim based on Kopera's perjury and also by failing to raise the issue of trial counsel's failure to unearth Kopera's perjury is also unavailing. There is no federal constitutional right to effective assistance of post-conviction counsel. *See Coleman*, 501 U.S. at 752. In fact, the AEDPA specifically provides that "the ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding under section 2254." 28 U.S.C. § 2254(i). Therefore, the Court will deny Petitioner's ineffective assistance of post-conviction counsel argument because it does not assert an issue cognizable on federal habeas review.[7] *See, e.g., Jordan v. Sup't Somerset SCI*, 2017 WL 5564555, at *1 (3d Cir. Feb. 15, 2017) ("[C]laims alleging ineffective assistance of PCRA counsel are non-cognizable in federal habeas, 28 U.S.C. § 2254(i).").

---

[7]Even if the Court were to examine the issue of post-conviction counsel's alleged ineffectiveness, the argument lacks merit due to the determination that the underlying *Brady* claim is meritless.

Accordingly, the Court will deny Claim Four in its entirety.

### E. Claim Five: Cumulative Error

In his final Claim, Petitioner contends that the "circumstances of this case demonstrate that the cumulative effect of the errors alleged herein so undermined the fairness of the trial that the Petitioner's conviction must be vacated." (D.I. 52 at 46) Pursuant to the cumulative error doctrine,

> [i]ndividual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process. Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish actual prejudice.

*Fahy v. Horn,* 516 F.3d 169, 205 (3d Cir.2008).

Petitioner concedes that Claim Five is procedurally defaulted because he never presented it to the Delaware state courts. (D.I. 63 at 32) For the following reasons, the Court concludes that Claim Five does not warrant relief.

The United States Supreme Court has not recognized the concept of cumulative error. *See Bush v. Carpenter*, 926 F.3d 644, 686 n.16 (10th Cir. 2019). Since there is no clearly established Federal law with respect to a cumulative error argument, it would appear that the Court's analysis is over and Petitioner is not entitled to habeas relief for Claim Five.

The Third Circuit, however, has recognized the cumulative error doctrine on habeas review, holding that "a cumulative error argument constitutes a stand-alone

constitutional claim subject to exhaustion and procedural default." *Collins v. Sec'y of Pa. Dep't of Corr.* 742 F.3d 528, 542 (3d Cir. 2014). With respect to ineffective assistance of counsel claims, "cumulative review is proper under *Strickland*, "only after the petitioner's claims "surmount the first prong of the *Strickland* analysis." *Pursell v. Horn*, 187 F. Supp. 2d 260, 363 (W.D. Pa. 2002). In other words, the attorney's performance must be found to be deficient on the individual claims of error before the errors can be aggregated to demonstrate prejudice.

Here, Petitioner attempts to escape the procedural default of Claim Five by asserting it "would be unfair to require full exhaustion of a cumulative error claim in this case" because the factual basis for Claim Three (Bridgette Phillips $10,000 reward) was not known until 2007. This "unfairness" argument does not establish cause, and therefore, the Court alternatively finds that Claim Five is procedurally barred.

Finally, Petitioner's cumulative argument lacks merit. As previously discussed, the Court has concluded that Petitioner's substantive claims and related ineffective assistance allegations concerning both defense and post-conviction counsel lack merit and did not cause any prejudice. Since Petitioner has not provided anything to demonstrate "actual prejudice" even when the four Claims are considered together, the Court will alternatively deny Claim Five as meritless.

IV.    **PENDING MOTIONS**

   **A. Evidentiary Hearing**

Petitioner asks the Court to "schedule an evidentiary hearing on any claims upon which there is a dispute of material fact between Petitioner and the State for which there

is cause for failure to develop the record in the state court or for which there was no opportunity to develop a factual record in state court." (D.I. 52 at 49) More specifically, Petitioner requests an evidentiary hearing to establish ineffective assistance of state post-conviction counsel as cause for the default of the claim of ineffective assistance of trial counsel related to Claim Three (*Brady* violation based on failure to disclose Phillips' $10,000 reward). (D.I. 52 at 41)

Typically, requests for an evidentiary hearing in a federal habeas proceeding are evaluated under 28 U.S.C. § 2254(e)(2), which provides that a federal district court should hold an evidentiary hearing if two conditions are met: (1) the petition's factual allegations, if true, would entitle the petitioner to relief; and (2) for reasons beyond the petitioner's control, the factual claims were not previously the subject of a full and fair hearing in the state court. *See* 28 U.S.C. 2254(e)(2); *Townsend v. Sain*, 372 U.S. 293, 312-13 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992). The Third Circuit, however, has held that § 2254(e)(2) does not limit whether an evidentiary hearing is available to evaluate if a petitioner's procedural default may be excused. *See Cristin v. Brennan*, 281 F.3d 404, 416-17 (3d Cir. 2002). In such cases, the decision to grant an evidentiary hearing is "left to the sound discretion of district courts." *Goldblum v. Klem*, 510 F.3d 204, 221 (3d Cir. 2007).

The Court concludes that a hearing is unnecessary to determine if Petitioner's procedural defaults can be excused because, as previously discussed, the Court has essentially considered the merits of Petitioner's procedurally defaulted claims or has

determined that they are not cognizable. Accordingly, the Court will deny Petitioner's Motion for an Evidentiary Hearing.

## B. Discovery

Petitioner also asks the Court "to grant leave for Petitioner to file, within sixty (60) days, a Motion for Discovery pursuant to Rule 6, Rules Governing Section 2254 Proceedings in the United States District Courts." (D.I. 52 at 49) Petitioner's "formal request for discovery" is related to Claim Two (*Brady* violation due to "undisclosed conversation" in holding cell), and he requests additional information regarding the undisclosed conversation that occurred between Petitioner and the police before the police started recording his statement. (D.I. 52 at 33) Having already decided to deny the Petition in its entirety, the Court will deny as moot Petitioner's Motion for Leave to File a Motion for Discovery.

## V. CERTIFICATE OF APPEALABILITY

The Court must decide whether to issue a certificate of appealability. *See* 3d Cir. L.A.R. 22.2 (2011). A certificate of appealability may be issued only when a petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This showing is satisfied when the petitioner demonstrates "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

For the reasons stated above, the Court concludes that the Petition must be denied. Reasonable jurists would not find this Court's assessment of Petitioner's constitutional claims to be debatable or wrong. Consequently, Petitioner has failed to

make a substantial showing of the denial of a constitutional right, and a certificate of appealability will not be issued.

## VI.   CONCLUSION

For the foregoing reasons, the Court will deny the instant Petition.  An appropriate Order will be entered.